We'll hear argument next in Arkansas Public Employees Retirement System, the Xerox 18-1165. Good morning, your honors. May it please the court, Andrew Zivitz from Kessler Topaz on behalf of the lead plaintiff and the putative class. Your honors, we allege three categories of misstatements in this case. I plan to focus on the platform misstatements for purposes of my argument this morning. Right into the microphone, please. Sorry about that, your honor. Throughout the class period, Xerox represented that its health enterprise Medicaid platform was new. It was the first one created in 15 years, and it was a significant capital investment. And what made it unique, your honors, was it was a repeatable process, it could be reused across state customers, and it was a plug-and-play unit. That's what they wanted it to be, and a darn good idea. If it had worked, it would have been highly successful, which is what they said. And then at various points, they were saying, well, you know, we're optimistic. We think it's doing better, but boy, we got troubles. So what's the problem? I'll push back a little bit on that, your honor. The statements about the platform that describe the platform, defendants referred to them as it was a plug-and-play unit, it was a repeatable solution, it could be reused across state customers, and we've amassed evidence in this complaint which makes this case unique. We have documents showing that this was not a reusable solution. For example, in California, we have internal documents that we received through a Freedom of Information Act request stating that while this was heavily marketed as a transfer system, it appears to be a custom build. An email that California sent to Xerox stating this is nowhere close to a scalable product. We have to be transparent here that this is a custom application. In June of 2013, we have another document where California officials are noting that Xerox officials are creating quote-unquote new software as opposed to using the existing product as was originally intended. In addition, we have confidential witnesses who worked on the very state implementation stating that this was not a reusable product. For example, your honor, confidential witness number one, who was a former employee who worked on the implementation, stated this is not a transferable product. We don't have a product to transfer. Confidential witness number two, who worked on Alaska, stated that while the intent was to create a canned product, it never existed. Moreover, your honor, and this is critical because the district court did not address this. On April 24, 2015, the company admitted in one of our corrective disclosures that the they were still working to create a standardized platform. Let me actually state that statement for the record. This was on April 24, 2015, defendant Zapfel and Xerox stated on a conference call that they were still quote working to consolidate the customized instances of health enterprise into a standardized platform that would then be less costly to implement and manage going forward. That is completely counter to the statements they made throughout the class period saying that this could be reused across states, that this was a quote plug and play unit. And what the district court did here, your honors, and this is really where we believe the clear error lies, is the district court disregarded what defendants said about health enterprise. That it disregarded the characterizations of health enterprise. And in lieu of that, looked at the American Heritage Dictionary. And because the American Heritage Dictionary defines the term platform as computer architecture and because health enterprise was a computer program that necessarily the statements about the platform were not actionable. That is clear error because again, the defendants characterized the term health enterprise platform as reusable, repeatable, and a plug and play unit. And don't take our words for it, your honors. Look at what analysts said. We quote two of them at paragraphs 196 and 197 of our complaint. J.P. Morgan and Piper Jaffray both took what defendants were saying is that health enterprise provided the company with a quote unquote competitive advantage. Why? Because it could be implemented at low incremental cost, which would drive margins. The question is, to what extent were these statements about repeatability, plug and pay, and so on, to what extent were those statements of fact about what this thing was at the time that they were selling it? And to what extent were they statements of what they were hoping to achieve, trying to do because they knew that that is what would make it a viable and important financial success with a whole lot of statements of we ain't there yet. That for me is the question. I mean, which is it? And your honor, it's... The district court clearly thought it was the second. Actually, your honor, I think what the district court did was to find that the statements were not actionable because they had a computer program. Respectfully, the way the defendants... Let me back up for a second. When you look at the manner and context of presentation of these statements, which is what the second circuit held we need to do in the Smith-Barney case, which we said in our briefs, this was a company that was going from a traditional hardware company to a services company. And as part of that, they were investing in platforms quote unquote across the board. And platforms provided a quote unquote competitive advantage because they were reusable, because they were plug and play units. Though these were statements of fact... Are you saying that they weren't reused? They weren't. Isn't the whole thing that just ended up costing more money than they thought it would? No, your honor. But what happened was they claimed that it was a reusable unit, but as reflected in the documents that we have in black and white, it was not a reusable product. It was a custom build. And what's interesting here is the prior MMIS, the prior Medicaid platforms required custom building across states. What made, according to Xerox, what made Health Enterprise unique, what gave the company a quote unquote competitive advantage, was this was a reusable product. This was a plug and play product. And plug and play, if we're going to resort to dictionary definitions... What does that mean? Excuse me? What does that mean?  If you look in the dictionary what plug and play means... How are we supposed to do that? Excuse me? How are we supposed to look at the dictionary? Well, and that was kind of my alternative point is if we are going to resort to dictionary definitions, what plug and play means in computer lingo is you take it out of the box, you plug it into the wall, and it plays without modification. And that's what they were representing to investors. And it was accompanied by some cautionary language, wasn't it? Well, this is not a forward-looking statement, your honor. This is a present-tense statement. We have this. I mean, I think one of the statements is we now have the platform. We can reuse the platform.  That's where I'm not 100% clear on it. We can reuse the platform. You can read it that way, but you can also read it as saying, boy, if we succeed in doing this, do we make a pot of money for you? And your honor, as I mentioned, when you look at the statements as you must in their entirety, the rep... That's what I think we have to do to see to what extent this is people who are developing something, know what it is that will make it work, say that's what this is meant to be, even though it isn't, or whether they are saying, hey, we got it, kids, and we don't have problems on this. And the problem is, if it means what you just said, then why all the comments about problems? I mean, why all the comments about, but it ain't working yet, but we're not making money yet, but we are flat yet, but we are this yet, but we may be being sued, but we're not yet. You know, all those things which are quite inconsistent, we're saying, hey, we got it, kids. So I don't know. If I may address that point. I know I'm out of time, but if I may address that point, your honor. The statements they were making about cost overruns or the statement about a little bit of the system needs to be modified from transaction to transaction, nowhere in those statements did they say, we don't have a plug-and-play unit. What they said was, these are one-time charges. We're having a little bit more difficulty standing up this platform, but they continued to I agree with you that they nowhere said, we don't have a plug-and-play unit. Let me clarify. Whether these other statements are simply, our problems are of another sort, or whether there are more, that's what we have to go back and try to worry about. Let me clarify that last point, your honor, and then I'll close. They did say they didn't have a plug-and-play unit, though the first time they alluded to that was in one of our corrective disclosures where, years before, this was on April 24th, 2015. Sorry, you're right. Thank you, your honors. I recognize I'm over time. Ms. Goldstein. Thank you. Good morning, your honors. May it please the Court, Sandra Goldstein for Appellees. Your honors, building an MMIS, Medicaid Management Information System, is very, very complicated. You have all sorts of providers and patients and a lot of claims, etc. When you, and as I think your honors have alluded to, Xerox all along made very clear that this was complicated, that there were a lot of problems. Day one, literally day one of the class period, April 23rd, 2012, the CFO, Luca Maestri, says we've highlighted the pressure on service margins the past few quarters so the Q1 results were not unexpected. The largest factor is the ramp of new contracts, which we estimate is two-thirds of the margin decline. That's day one. The CEO, on the same day, day one, says we're facing pressure on margins as we make initial involvements to implement new service contracts. So absolutely, as your honors alluded to, the entirety from, and I have lists full of including talking about how hard it is to stand up these systems. It's hard, the CEO says it's hard to do. It's hard to stand these up. It costs more than we thought, etc. So clearly, from day one- Does it cost more than they thought because it wasn't repeatable? Does it cost more than they thought because, though they thought they had something that was repeatable, they were having other problems? The question is, what is it that they're getting across? Are they saying, we are Eli Whitney and we can repeat all these bullets forever and that's why we did that? Or are they saying, we ain't there yet? We're just Eli but not Whitney. Well, so look- Spoken like a true Yalie. Right. So one thing is clear, it was reusable. It doesn't mean, just like every few minutes, minutes may be an exaggeration, but weeks is not for sure, and days sometimes I get a notification that I need an update on some or other software, right? The fact, so this was reusable and this was reused, you know how we know this was reused? It went live in three different states, including the ones in which they had their two confidential witnesses. This went live, this was implemented, Health Enterprise was implemented in New Hampshire, in North Dakota, and in Alaska. So we know, and in fact, one of the confidential witnesses says, we took, I think it was the one in North Dakota, it was Confidential Witness One, who confirmed that they took the New Hampshire version and implemented it in North Dakota. Now, were there problems? Was it perfect? Did there need to be updates and corrections all along the way? Sure. But it was reused. It was a platform, as Judge Engelmeyer correctly- They have to change it dramatically when they went from New Hampshire to North Dakota, not just because of some quirks about a different climate or a different thing in North Dakota, but because of the thing was not in fact reusable, was something that had to be custom-made in each one. So certainly not because it wasn't reusable, because it was reused. As for exactly what caused what problems, that's not in the record. We don't know. We don't know. But obviously, as we well know, this is a 10b-5 case, and under the PSLRA, they're the ones who have to come in and tell us with stateless specificity, each statement alleged to have been misleading and the reason or reasons why it is misleading, and they haven't done that. So they focus on the word platform. We had a platform, and we reused that platform. So herein lies the case, right? So if the word platform means that it's easily reusable, that is, let's just, I know you're shaking your head no, but let's say that it's easily replicable across states, that tends to indicate to any reasonable investor a lack of significant costs associated with putting it out in different states, right? It would, except we never used the word easily. They did. We never used the word easily. But the thrust of the argument is that the word platform, when you say platform, when you use the term plug and play, that means, all right, we take the platform, we just keep replicating it without significant costs in each state, and yet that's not what happened. So it ended up being reused, but with a significant amount of costs. But we never said it's, first of all, I'll get to the one time the word plug and play was used, because I want to, it's now been said several times, it was used once, and I will get to that in one moment. But no one ever said this was simple, and indeed, as I mentioned, from day one, we could go through all the sites. Leave aside whether it's simple, the question that Judge Lohier asked is, does the term platform, and does the term plug and pay, if it was used, connote to an ordinary investor something that was, in fact, incorrect? Now, I have no idea what computer talk is, so for me, a platform is something I stand on to catch a train. I have no idea what any of this other stuff is. But the question that you have to address is, was the use of that term, without more clarification, sufficiently misleading? That's what the other side is arguing. And so the answer, right, and so the answer is the platform is a computer architecture upon which other applications may run, and we made very clear that we can reuse, so there is a platform putting other applications on it. So we say, actually also on the first day of the class board, as we put applications or states on that new platform, point being, we're saying, you have a platform and you put applications on that platform. And Ursula Burns, the CEO, says you have to modify that platform for every engagement. So we're saying that has to be, the platform is the underlying architecture, that's what a dictionary definition is, that's what the reasonable investor understands it to be, and then you take it and you have to make lots of changes to it state by state. Again, particularly in a scenario like this, when you're dealing with, every state has different rules. How could you possibly, every state has different rules, different hospitals, how could you different eligibility requirements, how could you possibly think you're going to take a New Hampshire out of a box and put it into North Dakota? The point is, of course you have to change it, all the rules are different. Anybody who's following in this industry, and we know from the Supreme Court, it's people who are following in this, people who are reasonable investors, they're not going to think you can take something out of a box, and in a complicated system like this, and just reapply, and just apply it. And again, that's part of what we have said all along, is this is complicated, this is taking longer than we thought, here are the problems, here's why, that's why our margins are problematic, et cetera, et cetera. Oh, this cautionary language, okay. Cautionary language. Now, I do want to hit the plug and play because it's been mentioned a couple of times. That was, so plug and play was used once, it's on March 7th, 2013, this is in Statement 27, and it's Mary Scanlon saying, if they want a plug and play, so she's talking about it's ground up, it's a service-oriented, architected platform, and the reason why that's important is because it allows us to provide the states with a platform. If they want a plug and play with different capabilities than they have, they're allowed to do that. She's actually talking about not the plug and play, if you plug the platform in and it works, she's saying you can have different capabilities that you put on that platform and have it work. That is the sole and only time plug and play is used, and it's completely mischaracterized, and again, literally that same day, Scanlon also says that health enterprise, quote, gives the states data and intelligence for them to build their programs and policies at the state level. That's a J at the Joint Appendix of 748. She also says, quote, we deliver innovation at the state level. She's not saying it's one size fits all, I take it out of the box and I magically make somehow all these states which have completely different rules, it's just going to work. She's saying you can take it and use applications on that platform at the state level. Thank you very much.  Let me respond to a few of counsel's points. First of all, defendants characterize the health enterprise platform as repeatable, replicable, and plug and play. It was their terms. It wasn't just the term platform, but it was their use of the term platform, and according to the company, they repeatedly touted the fact that because it was reusable, it provided a, quote, unquote, competitive advantage. Let me read a statement into the record. This is from May 17, 2012. It's at paragraph 175 of our complaint. It states, now that we've got the platform, we can reuse the platform as we acquire new contracts and therefore our cost of delivery of those contracts is going to be significantly lower than what our competitors can offer. This was a hard statement, a present representation of the existence of a platform that could be, was modular and could be used from state to state. Counsel said that it was reused. It was custom built in Alaska, New Hampshire, and North Dakota. They had some base code, but it had to be custom built, for example, in Alaska at 500 times the price of what the budget said, and multiple years after it was supposed to be delivered. And ultimately, with these cost overruns and these extensive delays, this aspect of the business met its demise, because this was not a customizable project or product. Let me just touch on the modification language, because counsel mentioned that. Defendant Burns, on October 24, 2013, did say, did use the word modification, but exactly what she said, and this is noticeably absent from defendant's briefs, but what she said was only a little bit of the system needed to be modified, the bulk of the investment does not have to change. That is absolutely consistent with the idea of having a reusable program. Thank you very much. Thank you.  We'll reserve the decision.